UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CALEB LEWIS,

        Petitioner,                      Case No. 1:07-cv-772

v.                                            Honorable Robert J. Jonker

CINDI S. CURTIN,

        Respondent.
_____/

## REPORT AND RECOMMENDATION

This is a habeas corpus action brought by a state prisoner under 28 U.S.C. § 2254. Petitioner Caleb Lewis presently is incarcerated with the Michigan Department of Corrections and housed at the Kinross Correctional Facility (KCF). He was convicted by an Ingham County jury on May 13, 2004, of two counts of assault with intent to rob while armed, MICH. COMP. LAWS § 750.89, two counts of armed robbery, MICH. COMP. LAWS § 750.529, and one count of possession of a firearm during the commission of a felony, MICH. COMP. LAWS § 750.227b(a). He was sentenced on June 30, 2004, to four concurrent terms of 18 to 50 years and one consecutive term of two years. In his *pro se* amended petition (docket #4), Petitioner raises four grounds for relief, as follows:

    I.      SUFFICIENCY OF THE EVIDENCE;

    II.     VIOLATION OF THE CONFRONTATION CLAUSE;

    III.    VIOLATION OF THE EIGHTH AMENDMENT BY IMPOSITION OF A SENTENCE THAT WAS NOT SUPPORTED BY SUFFICIENT EVIDENCE; and

IV.   ERROR IN SCORING IN OFFENSE VARIABLE UNDER THE SENTENCING GUIDELINES.

This Court issued an opinion finding that Petitioner failed to exhaust Grounds I and III of his amended petition and ordered him to show cause why he was entitled to a stay of the proceedings while he exhausted his claims in the state courts. The Court also informed Petitioner that he could proceed with only his exhausted claims. (Docket ##5, 6.) Petitioner filed a response asking the Court to review only his exhausted claims. (Docket #7.) Therefore, the Court ordered Respondent to file an answer or other pleading with respect to Grounds II and IV of the petition for writ of habeas corpus (docket #8). Respondent has filed an answer to the amended petition stating that the petition should be denied because Ground I is unexhausted (docket #13). Upon review and applying the AEDPA standards, I find that Ground II and IV are without merit. Accordingly, I recommend that the petition be denied.

**Procedural History**

### A.   Trial Court Proceedings

The state prosecution arose from a robbery of a Radio Shack located in Lansing Township, Ingham County, Michigan on July 8, 2002. Petitioner was charged with two counts of assault with intent to rob while armed, MICH. COMP. LAWS § 750.89, two counts of armed robbery, MICH. COMP. LAWS § 750.529, and one count of possession of a firearm during the commission of a felony, MICH. COMP. LAWS § 750.227b(a). Petitioner was tried before a jury beginning May 10 and ending May 13, 2004.

Around 5:00 p.m. on July 8, 2002, the Radio Shack on Clippert Street in Lansing, Michigan was robbed. Brain Raymond, was the assistant manager on duty that day. (Trial Transcript May 10, 2004 (TT1) at 111, docket #18.) He testified that two black men entered the

store while he was helping a customer. The taller man entered first and said "You all know what this is!" and moved to the east side of the store. (*Id.*) He then saw one of the customers get slapped and a gunman came toward him. (TT1 at 114.) The gunman leaned over the counter, pushed the gun into Raymond's ribs and told him to get moving. (TT1 at 116.) The other robber had the gun held to the back of the head of Miguel Rodriguez, who was the other employee in the store. (*Id.*) Raymond was herded into the back room along with Rodriguez and the customers. As Raymond was walking to the back, the alarm for the back door went off. Raymond heard the robber behind him, the taller man with the gun, say "did somebody go out the back door? If so, I'm going to shoot me somebody." (TT1 at 119.) The gunman was attempting to get to the back door, but he was blocked. Raymond grabbed the woman in front of him and fell to the side into the bathroom to get out of the robber's way. While in the bathroom, Raymond heard someone go outside and heard one gunman tell people to give him their wallets. (TT1 at 121.) After they sat in the back room for a while, one of the customers saw the two gunmen leave. (TT1 at 123.)

Barry Neumann testified that he was a customer in the store at the time of the robbery. (TT1 at 140.) One of the gunmen put a gun to the back of Neumann's neck and told him to get in the back of the store. (TT1 at 142.) When Neumann was in the back room he was forced to lie on the floor, and one of the gunman took his wallet. (TT1 at 142-43.) He did not see the full face of either of the gunmen and did not identify Petitioner as one of the gunmen. (TT1 at 149-150.)

Margaret Kronner testified that she was a customer in Radio Shack at the time of the robbery. (TT1 at 151-52.) She saw the two men walk into the store and noticed that the taller one, who she identified as Petitioner, was jumping up and down, waving and yelling. (TT1 at 153, 161-63.) She knew that she was in danger and tried to walk past the two men to exit out of the front of

the store. Petitioner struck her across the face and told her to "get back bitch." (TT1 at 153-54, 163.) Kronner then ran to the back of the store, saw the back door and exited the Radio Shack. (TT1 at 155-56.) She ran to the building next door, locked herself in a bathroom and called the police from her cellular phone. (TT1 at 156-58.)

Nora Whiting was also a customer and testified that she was talking to a clerk about a phone when the two gunmen came into the store. (TT1 at 180.) Petitioner went to the other side of the store and the shorter gunman approached Whiting, took her cell phone, stuck a gun in the back of her head and told her to go to the back room. (TT1 at 182-84, 194-95.)

Miguel Rodriguez was the employee working with Nora Whiting and was led to the back of the store at gunpoint by the shorter of the robbers. Rodriguez testified that the taller of the two robbers pushed past him in the storage area and ran out the back door after the alarm went off. (TT2 at 244-46.) The shorter of the robbers took Rodriguez's wallet. (TT2 at 250.)

Ryan Kioski was the store manager at the time of the robbery. He testified that he was in the back storage room when he heard screaming and saw somebody with a gun on the security camera monitor. (TT1 at 198-201.) When a customer ran through the storage area and out the back door, Kioski followed her. He ran next door to the car wash and called the police. (TT1 at 202-03.) About five minutes later, he saw two men walk from the store. He further testified that Petitioner had worked at the Radio Shack in the previous fall of 2001 for about three or four months. (TT1 at 207-08.) Kioski testified that there are three security cameras and that the recording flipped from one camera to the other. This resulted in certain camera views being lost while the other camera was recording. (TT1 at 198-99.)

About twenty-four minutes after the robbery occurred at Radio Shack, Petitioner and Troy Jackson arrived at a Target store. (Trial Transcript May 11, 2004 (TT2) at 307-308, docket #19.) Sara Neill testified that she was working as a protection specialist in charge of monitoring the cameras. (TT1 at 213-15) The parties stipulated that the Target video showed Petitioner, Troy Jackson and Diamond Jackson, Troy Jackson's sister. (TT1 at 216.) Neill testified that, on three separate transactions, Petitioner used Neumann's credit cards to purchase items and signed for each purchase. (TT1 at 219-24.)

Lieutenant John Draganchuk was employed at the Lansing Township Police Department at the time of the Radio Shack robbery. He testified that he reviewed the Radio Shack security video to identify the clothing of the robbers and the gun. He also obtained information regarding Neumann's stolen credit cards. (TT2 at 281-82.) He reviewed the security recordings from Target and concluded that the same two men who were the robbers at Radio Shack were the two men with Diamond Jackson at Target. (TT2 at 283-84.)

Draganchuk testified that a search warrant was executed on Diamond Jackson's apartment four days later on July 12. (TT2 at 289.) A number of items that were purchased at the Target store were found along with a TEC-9 firearm and two birth certificates for Caleb Demps. (TT2 at 289-90, 296.) The recovered TEC-9 matched the firearm being held in the left hand of the taller robber as seen on the Radio Shack video . (TT2 at 291.) After Sergeant Burns did some checking, a picture of Caleb Demps was found and matched the taller man in the Target security video. (TT2 at 292-293.) Draganchuk further testified that on July 16 he had a conversation with Troy Jackson, who identified Caleb Demps. (TT2 at 298.) Draganchuk testified that Troy Jackson admitted he was one of the robbers. (TT2 at 306-07.)

Officer Jeffrey Huduck testified that a number of items taken from Target were recovered during the search of Diamond Jackson's residence. (TT2 at 323-28.) Officer Frank Koenigsknecht testified that he was present at the time Diamond Jackson's residence was searched and the two birth certificates for Caleb Demps were found. (TT2 at 343.) He further testified that he searched the police database and discovered that Caleb Demps was an alias for Petitioner Caleb Lewis. He pulled up the picture of Petitioner, identified him as one of the men on the Target tape and then relayed that information to Draganchuk. (TT2 at 347.)

Officer James Young testified as an expert in forensic video enhancement. (TT2 at 351-52.) He related how he enhanced the Radio Shack video and Target security video to enable officers to make comparisons between and identifications of the robbers and the two men in the Target video. (TT2 at 362-363.)

Diamond Jackson testified that she was Troy Jackson's sister and knew Petitioner because her brother hung out with him and her cousins are related to him. (Trial Transcript May 13, 2004 (TT3) at 389, docket #20.) She testified that she was out shopping with Troy and Petitioner the day of the robbery. She split off from the two men to shop. They met at a Wendy's later and she drove them to a Target. (TT3 at 392-94.) On cross-examination she testified that she had not heard them discuss guns or stolen credit cards or seen them change their clothes. (TT3 at 401.)

The defense called Petitioner to testify. Petitioner testified that he was dating Diamond Jackson in 2002. He further testified that on July 8, 2002, his twentieth birthday, Diamond called him. After chatting about birthday plans, Diamond gave the phone to Troy, who told Petitioner that he had "plastic from a lick and if [Petitioner] used it for him [he] could get whatever [he] wanted." (TT3 at 417-18; 420.) Petitioner agreed and met up with Troy and Diamond in the

- 6 -

Target parking lot. (TT3 at 422.) Petitioner testified that he knew the cards were stolen and most of the credit cards were in the name Barry Neumann. (TT3 at 422-23.) However, he further testified that he did not participate in the robbery of the Radio Shack. (TT3 at 424.) On redirect, Petitioner stated that the Target videotape showed him placing a gun in the trunk because he saw it under the front passenger seat and did not want the gun around him, so he moved the gun to the trunk. (TT3 at 438-39.)

At the conclusion of trial, on May 13, 2004, the jury found Petitioner guilty of two counts of assault with intent to rob while armed, two counts of armed robbery, and one count of possession of a firearm during the commission of a felony. (TT3 at 516-517.) On June 30, 2004, he was sentenced to four concurrent terms of 18 to 50 years and one consecutive term of two years. (Sentencing Transcript, (S. Tr.), 17, docket #21.)

### B. Direct Appeal

According to the amended petition, Petitioner appealed his conviction and sentence to the Michigan Court of Appeals on July 23, 2004. Petitioner's first claim on appeal was that insufficient evidence existed to support conviction on all charges. Second, he argued that the trial court erred in allowing the prosecution to introduce through a police officer evidence of accomplice's statement that implicated Petitioner. Third, Petitioner argued that the trial court improperly scored his offense under the sentencing guidelines. Fourth, Petitioner contended that his sentence was imposed in violation of *Blakely v. Washington*, 542 U.S. 296 (2004). The court of appeals affirmed Petitioner's conviction.

Petitioner filed a *pro per* application for leave to appeal to the Michigan Supreme Court. In his application, Petitioner raised only the Confrontation Clause and sentencing claims, in

addition to a new issue: whether the prosecutor knowingly placed witnesses on the stand whose testimony was perjured. The Supreme Court denied leave to appeal on August 29, 2006.

### C. Post-conviction relief

Petitioner did not seek any post-conviction relief. (Pet. at 3.)

## Standard of Review

This action is governed by the Antiterrorism and Effective Death Penalty Act, PUB. L. 104-132, 110 STAT. 1214 (AEDPA). *See Penry v. Johnson*, 532 U.S. 782, 792 (2001). The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693-94 (2002). The AEDPA has "drastically changed" the nature of habeas review. *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655. In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts. *Bailey*, 271 F.3d at 655; *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000). The inquiry is "limited to an examination of the legal landscape as it would have

appeared to the Michigan state courts in light of Supreme Court precedent at the time [the petitioner's] conviction became final." *Onifer v. Tyszkiewicz*, 255 F.3d 313, 318 (6th Cir. 2001).

A decision of the state court may only be overturned if (1) it applies a rule that contradicts the governing law set forth by the Supreme Court, (2) it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result; (3) it identifies the correct governing legal rule from the Supreme Court precedent but unreasonably applies it to the facts of the case; or (4) it either unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend a principle to a context where it should apply. *Bailey*, 271 F.3d at 655 (citing *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694; *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).

A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411; *accord Bell*, 535 U.S. at 699. Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Williams*, 529 U.S. at 410.

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir.

1989).  Applying the foregoing standards under the AEDPA, I find that Petitioner is not entitled to relief.

## Discussion

*A.     Confrontation Clause*

Petitioner claims that his constitutional rights under the Confrontation Clause were violated by the admission of the hearsay statements of Troy Jackson.  Detective Draganchuk testified at trial about statements made to him by Troy Jackson during a police interview, despite the fact that Troy Jackson did not testify at Petitioner's trial.  Draganchuk testified that Troy Jackson admitted that he, Jackson, participated in the Radio Shack robbery.  The relevant testimony of Draganchuk was as follows:

> BY MR. FINNERTY [for prosecution on redirect]:
>
> Q.  Mr. Porter [for defense] asked you to draw a conclusion on is it your opinion that Troy Jackson and Caleb Lewis, because they were at Target with the credit cards, are also the people who committed the robberies.  Do you remember those questions?
>
> A.  Yes.
>
> Q.  All right. Now, after the robbery, was – and when I say after, in the days after the robbery, was Troy Jackson arrested?
>
> A.  Yes, he was.
>
> Q.  All right. And did you get a chance to interview him?
>
> A.  I did.
>
> Q.  All right. And during that interview, did you ask Troy Jackson whether he, Troy Jackson, committed the robbery at Radio Shack?
>
> A.  Yes.
>
> Q.  And what did he tell you as to his involvement?

| | | |
|---|---|---|
| MR. PORTER: | | I'm going to object, Your Honor, at this point. this is a Codefendant situation. I believe this would call for hearsay from Detective Draganchuk. |
| THE COURT: | | Okay. Mr. Finnerty? |
| MR. FINNERTY: | | Your Honor, it is not hearsay for two reasons. First, it's a Defendant/party opponent admission. |
| THE COURT: | | This is not a party opponent in this case. |
| MR. FINNERTY: | | Then I say it is a statement against penal interest. |
| THE COURT: | | I don't think that's admissible. But I think it is all right. First of all, the more important point is, is that an open-ended question was asked by opposing counsel and an answer was elicited that opened the door, in my opinion, for this response, because he was asked something and he did respond and make that statement. And so I think you can get in a limited comment merely to show that Mr. Jackson may or may not have indicated his own involvement. |
| MR. FINNERTY: | | Okay. |
| THE COURT: | | That's where we are. Okay. Go ahead. |
| MR. FINNERTY: | | Thank you, Your Honor. |

Q. (BY MR. FINNERTY) Would you please answer the question with regard to did Troy Jackson admit that he was one of the two robbers at Radio Shack that day?

A. The answer is yes, he did. (TT2 at 305-07.)

The Michigan Court of Appeals addressed Petitioner's confrontation clause claim as follows:

Defendant first argues that the trial court erred in allowing the prosecution to question Detective John Draganchuk about a statement made by Troy Jackson admitting to being one of the robbers and stating that defendant was his accomplice. Defendant argues that his Sixth Amendment right to confront and cross-examine the witness was violated. Defendant did not object on this ground below, so it is

- 11 -

unpreserved. *People v Aldrich*, 246 Mich App 101, 113; 631 NW2d 67 (2001). We review for plain error that affected defendant's substantial rights. *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). We agree that the trial court erred in allowing the testimony, but we also conclude that it was harmless in light of the overwhelming other evidence.

The Sixth Amendment prohibits testimonial statements from a witness who did not testify at trial unless the witness was unavailable to testify and the defendant had a prior opportunity for cross-examination. *Crawford v Washington*, 541 US 36, 53-54; 124 S Ct 1354; 158 L Ed 2d 177 (2004). Statements elicited under police interrogations, as was the statement here, are testimonial. *Id*. at 52. Troy did not testify at trial and was not subject to cross-examination. Therefore, the trial court plainly erred in admitting his testimonial statements into evidence through Draganchuk. However, plain error generally does not warrant reversal unless it prejudiced defendant. *Carines*, *supra* at 763. Admission of a testimonial statement from a witness in violation of the Confrontation Clause is not the kind of structural error that automatically requires reversal. *People v Shepherd*, 472 Mich 343, 347; 697 NW2d 144 (2005). Instead, we examine the entire record "to evaluate whether it is clear, beyond a reasonable doubt, that the jury verdict would have been the same absent the error." *Id*. at 348. We find that it is.

There were numerous eyewitnesses to the robbery. One victim identified defendant as the man who struck her in the face. Defendant's girlfriend at the time of the robbery testified that defendant and Troy met her together on the day of the robbery, and she drove them to Target. There was testimony that defendant was the same individual in two security camera videotapes: the recording of the robbery and a recording made at Target approximately half an hour later, where defendant used one of the credit cards that had been taken from the robbery victims. Defendant admitted that the Target recording showed him removing from his waistband a gun that matched the gun in the robbery recording and the gun later recovered by police from defendant's girlfriend's house. Moreover, defendant testified that Troy essentially admitted to the robbery when he told defendant that the credit cards had been stolen. As a result, any supposed harm that his accomplice's admissions had on defendant was negated by defendant's testimony. Thus, after a careful review of the record, the error was harmless beyond a reasonable doubt, and defendant is not entitled to relief based on this issue.

*Michigan v. Lewis*, Docket #257196 (MCOA Dec. 8, 2005) (Op. at 1-2).

The Confrontation Clause of the Sixth Amendment gives the accused the right "to be confronted with the witnesses against him." U.S. CONST., Am. VI. The Supreme Court has long

read this right as securing an adequate opportunity to cross-examine adverse witnesses. *United States v. Owens*, 484 U.S. 554, 557 (1988) (citing *Mattox v. United States*, 156 U.S. 237, 242-43 (1895) and *Douglas v. Alabama*, 380 U.S. 415, 418 (1965)); *California v. Green*, 399 U.S. 149, 157-58 (1970). Out-of-court statements by witnesses that are testimonial are barred, under the Confrontation Clause, unless witnesses are unavailable and defendants had a prior opportunity to cross-examine witnesses, regardless of whether such statements are deemed reliable by the court. *Crawford v. Washington*, 541 U.S. 36 (2004) (abrogating *Ohio v. Roberts*, 448 U.S. 56 (1980)). The Court admitted out-of-court statements made by Troy Jackson who Petitioner did not have a prior opportunity to cross-examine and who was not shown to be unavailable. Therefore, the admission of the hearsay statements of Troy Jackson was a violation of the Confrontation Clause.

A violation of the Confrontation Clause is subject to harmless error analysis. *See Delaware v. VanArsdall*, 475 U.S. 673, 684 (1986); *Hill v. Brigano*, 199 F.3d 833, 846-47 (6th Cir. 1999). In *Mitchell v. Esparaza*, 540 U.S. 12, 17-18 (2003), the Supreme Court held that when a state court determines that a constitutional violation is harmless, a federal court may not award habeas relief under § 2254 unless the harmlessness determination itself is unreasonable. In *Fry v. Pliler*, 551 U.S. 112 (2007), the Supreme Court held that "in § 2254 proceedings a court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the 'substantial and injurious effect' standard set forth in *Brecht* [*v. Abrahamson*, 507 U.S. 619 (1993)], whether or not the state appellate court recognized the error and reviewed it for harmlessness under the 'harmless beyond a reasonable doubt' standard set forth in *Chapman*." 551 at 121-22 (citations omitted). In determining whether the restriction was harmless, a court must consider a number of factors, "'includ[ing] the importance of the witness' testimony in the prosecution's case, whether the

testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.'" *Hargrave v. McKee*, 248 F. App'x 718, 728 (6th Cir. 2007) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986)).

Here, Troy Jackson's hearsay statements were cumulative of the other evidence presented at trial. *See Anthony v. DeWitt*, 295 F.3d 554, 564 (6th Cir. 2002) (admission of hearsay evidence was at best harmless because it was cumulative of other evidence); *Hill v. Brigano*, 199 F.3d 833, 847 (6th Cir. 1999) (where majority of information already before the jury and the evidence of guilt was strong, Confrontation Clause error was harmless). Kronner identified Petitioner as one of the robbers at Radio Shack who struck her across the face when she attempted to exit the store. (TT1 at 153-56, 163.) Diamond Jackson, who was Petitioner's girlfriend and Troy Jackson's sister, testified that she met them on the day of the robberies and drove them to a Target. (TT3 at 392-94.) Young, the forensic video expert, identified Petitioner in the Target security video as one of the robbers on the Radio Shack video. (TT2 at 365-67.) Petitioner admitted that he was one of the men on the Target security video. (TT3 at 424.) Additionally, Petitioner testified that Troy Jackson essentially admitted committing the Radio Shack robbery when he told Petitioner that "he had some plastic from a lick" and that a robbery would be considered "hitting a lick." (TT3 at 420, 429.) In light of the ample evidence presented at trial, the admission of Troy Jackson's hearsay statements was a harmless error under *Brecht*. Therefore, the decision of the Michigan Court of Appeals finding harmless error under the *Chapman* standard cannot be deemed contrary to or an unreasonable application of clearly established Supreme Court authority and Petitioner's Confrontation Clause challenge fails.

B.  *Sentencing Scoring*

Petitioner argues in his other ground that he is entitled to re-sentencing because the sentencing court improperly scored offense variable (OV) 7 under the Michigan sentencing guidelines, resulting in the calculation of a higher sentencing range. The Michigan Court of Appeals addressed this ground as follows:

> Defendant next argues that the trial court improperly scored Offense Variable ("OV") 7, aggravated physical abuse, resulting in an alleged improper upward departure from the minimum sentencing guidelines range. We disagree.
>
> Scoring decisions should be upheld if there is any evidence to support the decision. *People v Hornsby*, 251 Mich App 462, 468; 650 NW2d 700 (2002). In calculating OV 7 of the sentencing guidelines, a court must assess fifty points if "[a] victim was treated with sadism, torture, or excessive brutality or conduct designed to substantially increase the fear and anxiety a victim suffered during the offense." MCL 777.37(1)(a). A sentencing court may consider all record evidence before it, including the contents of a presentence investigation report or testimony taken at a preliminary examination or trial. *People v Ratkov* (*After Remand*), 201 Mich App 123, 125; 505 NW2d 886 (1993).
>
> A victim testified that defendant punched her in the face, causing a concussion, and that she thought she was going to die. Another victim testified that the taller gunman, who could reasonably be determined to have been defendant, pushed him below the ribcage with his gun, and he feared that it would go off. The taller gunman threatened to "shoot me somebody" upon discovering the back door open and the alarm going off. These facts support a determination that defendant engaged in conduct during the offense that was designed to substantially increase the fear and anxiety of his victims. Therefore, we uphold the trial court's scoring of OV 7. *Hornsby, supra* at 468.

*Michigan v. Lewis*, Docket #257196 (MCOA Dec. 8, 2005) (Op. at 2).

Claims concerning the improper scoring of sentencing guidelines are state-law claims and typically are not cognizable in habeas corpus proceedings. *See Hutto v. Davis*, 454 U.S. 370, 373-74 (1982) (federal courts normally do not review a sentence for a term of years that falls within the limits prescribed by the state legislature); *Austin v. Jackson*, 213 F.3d 298, 301-02 (6th Cir.

2000) (alleged violation of state law with respect to sentencing is not subject to federal habeas relief); *Cheatham v. Hosey*, No. 93-1319, 1993 WL 478854, at *2 (6th Cir. Nov. 19, 1993) (departure from sentencing guidelines is an issue of state law, and, thus, not cognizable in federal habeas review); *Cook v. Stegall*, 56 F. Supp. 2d 788, 797 (E.D. Mich. 1999) (the sentencing guidelines establish only rules of state law). There is no constitutional right to individualized sentencing. *Harmelin v. Michigan*, 501 U.S. 957, 995 (1991); *United States v. Thomas*, 49 F.3d 253, 261 (6th Cir. 1995); *see also Lockett v. Ohio*, 438 U.S. 586, 604-05 (1978) (in a case holding that mitigating factors must be fully considered in death penalty cases, the Court "recognize[d] that, in noncapital cases, the established practice of individualized sentences rests not on constitutional commands, but on public policy enacted into statutes."). Moreover, a criminal defendant has "no federal constitutional right to be sentenced within Michigan's guideline minimum sentence recommendations." *Doyle v. Scutt*, 347 F. Supp. 2d 474, 485 (E.D. Mich. 2004); *accord Lovely v. Jackson*, 337 F. Supp. 2d 969, 977 (E.D. Mich. 2004); *Thomas v. Foltz*, 654 F. Supp. 105, 106-07 (E.D. Mich. 1987). Finally, petitioner has no federal right to an individualized sentence, this ground presents an issue of state law only. Petitioner has not alleged grounds for the Court to conclude that this is one of those rare instances where an alleged state-law sentencing error was so egregious that it led to a fundamentally unfair outcome. *See Koras v. Robinson,* 123 F. App'x 207, 213 (6th Cir. Feb. 15, 2005) (citing *Bowling v. Parker*, 344 F.3d 487, 521 (6th Cir. 2003)).

To the extent Petitioner raises an argument under *Blakely v. Washington*, 542 U.S. 296 (2004), his claim also fails. (Ex. to Am. Pet., docket #4-2 at 5.) Petitioner argues that the sentencing judge violated his Sixth Amendment right to a trial by jury by using, to enhance his sentence, facts that had not been admitted by Petitioner or found by a jury beyond a reasonable

doubt.  *Blakely* concerned the State of Washington's determinate sentencing system, which allowed a trial judge to elevate the maximum sentence permitted by law on the basis of facts not found by the jury but by the judge.  Applying the Washington mandatory sentencing guidelines, the trial judge found facts that increased the maximum sentence faced by the defendant.  The Supreme Court found that this scheme offended the Sixth Amendment, because any fact that increases or enhances a penalty for the crime beyond the prescribed statutory maximum for the offense must be submitted to the jury and proven beyond a reasonable doubt.  *Blakely,* 542 U.S. at 301 (citing *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000)).

Unlike the State of Washington's determinate sentencing system, the State of Michigan has an indeterminate sentencing system in which the defendant is given a sentence with a minimum and a maximum term.  The maximum sentence is not determined by the trial judge, but is set by law. *See People v. Drohan,* 715 N.W.2d 778, 789-91 (Mich. 2006) (citing MICH. COMP. LAWS § 769.8).  Only the minimum sentence is based on the applicable sentencing guideline range.  *Id.*; *and see People v. Babcock*, 666 N.W.2d 231, 236 n.7 (Mich. 2003) (citing MICH. COMP. LAWS § 769.34(2)).  The Sixth Circuit authoritatively has held that the Michigan indeterminate sentencing system does not run afoul of *Blakely*.  *See Chontos v. Berghuis*, 585 F.3d 1000, 1002 (6th Cir. Nov. 10, 2009) (affirming district court's dismissal of prisoner's claim under *Blakely v. Washington* because it does not apply to Michigan's indeterminate sentencing scheme); *Tironi v. Birkett*, 252 F. App'x 724, 725 (6th Cir. 2007).  Therefore, the state court's determination of Petitioner's claim was not contrary to federal law clearly established by the United States Supreme Court or an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

### Recommended Disposition

For the foregoing reasons, I respectfully recommend that the habeas corpus petition be denied.


Dated:  August 10, 2010 /s/ Hugh W. Brenneman, Jr.
HUGH W. BRENNEMAN, JR.
United States Magistrate Judge


### NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within 14 days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal.  *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).